# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Midland Paper Company, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:20-CV-07340 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| Sagacity Media, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Midland Paper Company entered into an agreement with Sagacity Media, Inc. to supply paper for Sagacity. Sagacity later terminated the agreement and paid for some, but not all, of the outstanding invoices charged to Sagacity by Midland. Midland brought this breach of contract lawsuit against Sagacity for the unpaid invoices. R. 1, Compl.[1] Midland moves for summary judgment on the merits, asserting that it has shown as a matter of law that Sagacity breached the contract. R. 78, Pl.'s Merits Mot. Both parties also move for summary judgment on the issue of attorneys' fees, with Midland asserting that their agreement requires that Sagacity pay Midland's attorneys' fees in this case, and Sagacity asserting that it does not. R. 74, Pl.'s Fees Mot.; R. 69, Def.'s Fees Mot. For the reasons below, Midland's motion on its breach of contract claim is granted, and both parties' motions on attorneys' fees are denied.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

## I. Background

Much of the facts below are undisputed, and any disputes of relevant facts are specifically noted.

Midland is a company that facilitates the purchase and shipping of paper, and Sagacity is a media company that publishes a variety of publications like regional magazines. *See* R. 91, Def.'s Resp. PSOF ¶ 4; R. 90, Def.'s Merits Resp. at 1. In the fall of 2015, Midland and Sagacity began doing business together; Sagacity needed paper for its publications, and Midland agreed to manage Sagacity's paper needs. R. 75, Pl.'s Resp. DSOF ¶ 6; R. 82, Defs.' Resp. Add'l PSOF ¶ 2; *see also* R. 90, Def.'s Merits Resp. at 1. Sagacity and Midland transacted through the following process: Sagacity would provide Midland with forecasts of Sagacity's anticipated paper needs, and Midland would set a "last day to change" date, by which Sagacity either needed to confirm that its forecasted needs remained the same or alter the order. R. 91, Def.'s Resp. PSOF ¶ 7; *see also* R. 80-3, PSOF, Exh. C (Yo Dep.) at 23:9–24:2. So, as a "last day to change" deadline approached, Midland and Sagacity would discuss the upcoming order, and Sagacity would confirm or modify the order as needed. Yo Dep. at 25:2–12, 39:11–40:10, 41:1–7; *see* R. 80-2, Exh. B, Grp. Exh. 3.

Midland would then order the paper from paper mills and ship it to various printers. Yo Dep. at 24:7–11; *see* R. 91 ¶¶ 8, 10. Once the printers used the paper to print Sagacity's publications, Midland would submit an invoice to Sagacity for that paper. Yo Dep. at 62:15–23; *see* R. 93, Add'l DSOF, Exh. C (Vogel Dep.) at 51:5–11. Because the ordering process was not always precise, sometimes Sagacity would not

2

use all the paper it had ordered for a given publication. R. 80-2, Morley 11/11/22 Decl. ¶ (h); Yo Dep. 36:24–37:15. That excess paper would be stored at the printers until it could be used for another Sagacity publication. Morley 11/11/22 Decl. ¶ (h); Yo Dep. 36:24–37:15; *see* R. 93, Vogel Dep. 17:12–18:11. The parties did business in this fashion for around four years, during which Midland sent Sagacity hundreds of invoices. *See* R. 82, Defs.' Resp. Add'l PSOF ¶ 2 (agreeing that the parties' business relationship began in 2015 and that Midland sent "numerous invoices" prior to February 2019); *see, e.g.*, R. 76, PSOF, Exh. B pt. 2.

At some point, Sagacity became concerned about the excess paper sitting unused at printers, and in response Midland suggested a "consignment agreement," under which Midland would own and be responsible for the excess paper until Sagacity actually used it. *See* R. 93, Vogel Dep. 17:14–19:1. In February 2019, the parties entered into a written Consignment Inventory Agreement, under which Midland "agreed to … retain[] ownership" of paper ordered by Sagacity "as Consigned Inventory," until the paper "is reported as Usage by the Printer." R. 1-1, Agreement at 1; R. 82, Defs.' Resp. Add'l PSOF ¶ 1. In other words, the paper would be owned by Midland as "Inventory" until a printer used it, at which point Sagacity would be billed for that paper. But the Agreement also stated that in the event the Agreement was terminated, "all remaining Inventory at Printer(s) locations," as well as any paper "from existing, valid Purchase Orders in-transit or in manufacturing," would be invoiced to *Sagacity*, and Sagacity would be "obligated to pay all invoices billed due to the termination provisions [of the Agreement]." Agreement at 2.

In addition, under a provision titled "Inventory," the Agreement supposedly required Sagacity to issue purchase orders for paper:

> Customer will issue a valid Purchase Order detailing the product description, quantity, and price for the Products from Midland …. Midland in turn will place their Purchase Order with the appropriate paper mill ("Mill"), which will manufacture and ship to a printer location ("Printer"), designated by the Customer.

Agreement at 1.[2] But contrary to this provision, the parties did not initiate transactions by "issu[ing] a valid Purchase Order" even after signing the Agreement. *Id.* Instead, they continued doing business through the process they had used before signing the Agreement: Sagacity continued to send Midland forecasts of paper needs, which would be confirmed closer to the last-day-to-change date, upon which Midland would order and ship the paper. Yo Dep. at 36:3–12, 41:1–7; *see, e.g.*, R. 80-2, PSOF, Exh. B at 42–43 (Mar. 28, 2019 emails).

Using the pre-existing forecast-and-confirmation process—even after signing the Agreement in February 2019—Midland placed numerous paper orders for Sagacity, sending Sagacity about 140 invoices. *See* R. 76, Exh. A (Morley 10/26/22 Dep.) ¶ (1)(d)–(e); Morley 10/26/22 Dep., Exh. 2 (List of 2019 Invoices); R. 82, Defs.' Resp. Add'l PSOF ¶ 5 (generally agreeing with Midland's statement that Midland issued 140 invoices to Sagacity from February through December 2019, though caveating that Sagacity "does not necessarily agree that precisely 140 invoices were issued"); R. 91, Def.'s Resp. PSOF ¶ 10 (contending only that around September 2019, Sagacity

---

[2]The Agreement also included modification and waiver provisions, which are discussed below.

asserted it wanted to use purchase orders, and raising no dispute that before September 2019, the parties "operated pursuant to [their usual] arrangement").[3] At the bottom of each of these invoices was a statement that the order was "subject to the terms and conditions" on Midland's website. Dec. 2019 Invoices; *see, e.g.*, R. 76, PSOF, Exh. B pt. 2, at 1 (invoice dated Dec. 7, 2016); *see generally* R. 71, Def.'s Fees Br. (not disputing that Midland's invoices listed this statement containing a website link to Midland's Terms and Conditions); R. 81, Def.'s Fees Resp. (same).

On October 4, 2019, Sagacity decided to terminate the Agreement and gave Midland notice of the termination. R. 91, Def.'s Resp. PSOF ¶ 14. The Agreement required 60 days' notice for termination, so the contract terminated on December 3, 2019. *Id.*

After the contract was terminated, Midland requested payment from Sagacity for the invoices that remained outstanding. R. 75, Pl.'s Resp. DSOF ¶ 10. These included invoices for paper that, according to Midland, it had procured for Sagacity (through their forecast-and-confirmation process) that had been sitting unused at the

---

[3]Sagacity agrees that Midland issued "various" invoices from February to December 2019, but notes that it "does not necessarily agree that precisely 140 invoices were issued" during this time. R. 82, Def.'s Resp. Add'l PSOF ¶ 5. But Sagacity does not articulate why it does not "necessarily agree" with the 140-invoice figure or provide an alternative figure; Sagacity also does not dispute that the List of 2019 Invoices accurately captures the invoices issued by Midland to Sagacity (even if Sagacity argues it is not bound to pay for those listed invoices). Morley 10/26/22 Dep., Exh. 2 (List of 2019 Invoices).

printers. *See* R. 91, Def.'s Resp. PSOF ¶ 16 (acknowledging receipt of December 2019 invoices).[4]

The outstanding invoices submitted by Midland totaled $133,094.08. 10/26/22 Morley Decl. ¶ (d); R. 1-2, Grp. Exh. B, (Dec. 2019 Invoices); *see* R. 71, Def.'s Fees Br. at 6 (acknowledging that Midland sent Sagacity final invoices). Sagacity paid off some of the outstanding invoices but declined to pay the others; of the outstanding invoices submitted, Sagacity declined to pay for 12 invoices. *See* R. 92, Add'l DSOF ¶ 7; R. 77, Pl.'s Fees Resp. at 7; R. 1-3 (Nov. 2020 Statement); Dec. 2019 Invoices. The remaining unpaid invoices totaled $88,102.00. R. 1-3 (Nov. 2020 Statement); R. 80-2, Morley 11/11/22 Decl. ¶ (p). Midland then sued Sagacity for the unpaid invoices, asserting

---

[4]Sagacity disputes the "status" of the paper for which Sagacity refuses to pay, *see* R. 91 ¶ 15, 16, broadly asserting that there are factual questions about whether the paper in dispute "really exists" and whether it "was actually shipped to Sagacity's third-party printer locations." R. 90, Def.'s Merits Resp. at 90. But there is little evidence in the record to support that the paper might not "really exist[]" or that the paper was incorrectly or fraudulently ordered without any authorization or confirmation from Sagacity. To the contrary, the record supports that the disputed paper actually existed and was, as recorded in the invoices, shipped to printers. For instance, Sagacity's President Vogel testified in her deposition that one printer "believed the [disputed] paper existed" and that Vogel saw pictures of the disputed paper. R. 76, PSOF, Exh. C (Vogel Dep.) at 75:7–19; *see also* Yo Dep. at 60:22–24 (responding, "I think they're at Quad" (a printer) when asked whether he had "any knowledge of where the [disputed] paper … in those invoices is now); *id.* (testifying "as far as I know, Midland never ordered paper for us without [a last date change confirmation]").

And Sagacity merely points to some unimportant, minor inconsistencies in the invoices, like the publication titles listed on the disputed invoices. R. 90, Def.'s Merits Resp. at 6–7. Even construing all the evidence in Sagacity's favor, Sagacity has failed to point to more than a "scintilla of evidence" to show that the existence of the paper and the validity of the invoices in the record—that they reflect paper that Midland actually ordered and shipped for Sagacity—are genuine issues for trial. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991); *see also Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (N.D. Ill. 2003) ("The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986))).

that Sagacity breached their contract.[5] Compl. ¶¶ 17, 24–28. Midland also sought attorneys' fees from Sagacity, relying on the attorneys' fees provision in its Terms and Conditions found on the Midland website. Compl. ¶ 16.

Midland now seeks summary judgment, arguing that it has shown Sagacity breached the Agreement as a matter of law. Midland and Sagacity both move for summary judgment on attorneys' fees: Midland asserts it has established that Sagacity must pay for its reasonable attorneys' fees if it prevails on the merits, whereas Sagacity insists that as a matter of law, Midland is not entitled to attorneys' fees under the Agreement. R. 74, Pl.'s Fees Mot.; R. 69, Def.'s Fees Mot.

## II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a summary judgment motion, the Court must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would

---

[5]Midland also alleged a claim for accounts stated, which it asserts as an alternative to its breach of contract claim. R. 79, Pl.'s Br. at 10.

be admissible in evidence," Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

In deciding cross motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). So when the Court evaluates Sagacity's summary judgment motion, Midland gets the benefit of reasonable inferences; conversely, when evaluating Midland's motion, the Court gives Sagacity the benefit of the doubt. This "process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150*, 335 F.3d 643, 648 (7th Cir. 2003).

### III. Analysis

The Court first addresses Midland's motion seeking summary judgment on its breach of contract claim, then turns to the parties' cross motions for summary judgment on the issue of attorneys' fees.

## A. Breach of Contract

Midland contends that Sagacity breached the Agreement when it refused to pay outstanding invoices, amounting to $88,102.00, for paper that Midland shipped to the printers for Sagacity. Under Illinois law,[6] to establish a breach of contract claim, the plaintiff must show "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015). The goal in construing a contract is to effectuate the parties' intent. *Empress Casino Joliet Corp. v. W.E. O'Neil Constr. Co.*, 68 N.E.3d 856, 869 (Ill. App. Ct. 2016). To do so, the Court must begin with examining "the plain language of the contract." *Id.* If the language is clear and unambiguous, courts give them their plain, ordinary, and popular meaning. *Id.*; *see also Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 368 (Ill. 1998) ("The terms of an agreement ... should generally be enforced as they appear.").

The parties here do not dispute that the Agreement is a valid and enforceable contract. It is also undisputed that since the beginning of their business relationship, Sagacity ordered paper through a forecast-and-confirmation process: Sagacity sent Midland a forecast of needs, which Sagacity later confirmed or altered with Midland

---

[6]The Agreement states that it "will be governed and construed by the laws of the State of Illinois," and the parties agree that Illinois law governs their contract. Agreement at 2; *see* R. 71, Def.'s Fee Br. at 7; R. 79, Pl.'s Merits Br. at 5; *Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 266 (7th Cir. 2016) ("If no party raises a choice of law issue to the district court, the federal court may simply apply the forum state's substantive law." (cleaned up)); *Hendricks v. Novae Corp. Underwriting, Ltd.*, 868 F.3d 542, 545 (7th Cir. 2017) ("Under Illinois law the contract's choice-of-law clause generally controls.").

before the "last day to change," which would then prompt Midland to order and ship the paper. R. 82, Defs.' Resp. Add'l PSOF ¶ 2; Yo Dep. at 24:7–11, 60:22–24; *see* R. 91, Def.'s Resp. PSOF ¶ 10; *e.g.*, R. 80-2, PSOF, Exh. B at 42–43 (Mar. 28, 2019 emails). Sagacity does not dispute that this is how the parties transacted since they began doing business together in 2015. Nor does Sagacity assert that Midland deviated from this course of conduct during their contractual relationship.[7] *See* R. 90, Def.'s Merits Resp.

Instead, Sagacity argues that once the parties entered into the Agreement in February 2019, the parties were required to conduct business differently: Sagacity was to first "issue a valid Purchase Order," and Midland was to procure paper for Sagacity based on those purchase orders. *Id.* at 7–9 (quoting Agreement at 2). Sagacity argues that Midland, by proceeding based on Sagacity's forecasted needs and confirmations instead, violated the purchase-order requirement in the Agreement, thereby excusing Sagacity from paying for the paper.

Midland, in turn, argues that the purchase-order term of the Agreement was modified by the parties' consistent conduct and performance. R. 79, Pl.'s Merits Br. at 6–9. After all, Sagacity itself continued to order paper through the parties' forecast-and-confirmation process—without ever submitting a purchase order, even after signing the Agreement. R. 90, Def.'s Resp. at 2, 9 ("It is undisputed that Sagacity

---

[7]Sagacity does argue, however, that around September 2019, Sagacity President Nicole Vogel objected to this course of conduct, raising concern that there were no purchase orders. This argument is discussed below. *See infra* 16 n.3.

never issued any such "Purchase[] Order."). Sagacity also paid for several of those post-Agreement invoices. *See* R. 92, Add'l DSOF ¶ 7; R. 1-3 (Nov. 2020 Statement); Dec. 2019 Invoices. But Sagacity suggests that the purchase-order term could not be modified by conduct and performance because the Agreement barred non-written modifications: any modifications were required to be "executed in writing by both parties." Agreement at 1 (modification clause); *see* R. 90; R. 81.

To determine whether the Agreement's modification clause barred the parties from modifying the contract by conduct and performance, the Court turns to the Uniform Commercial Code (UCC), which Illinois law applies to transactions in goods. *See* 810 ILCS 5/2-102. UCC Section 2-209(2), which has been adopted by Illinois statute, provides that "[a] signed agreement which excluded modification or rescission except by a signed writing cannot be otherwise modified or rescinded." 810 ILCS 5/2-209(2). At the same time, however, Section 2-209(4) provides an exception: an "attempt at modification" which does not satisfy a contractual requirement that modifications be in writing can nevertheless "operate as a waiver." 810 ILCS 5/2-209(4). "Such a waiver under the Uniform Commercial Code may take place through *conduct* as well as words." *Am. Suzuki Motor Co. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1386 (7th Cir. 1995) (cleaned up) (emphasis added); *see also* U.C.C. 2-209, cmt. 4 ("Subsection (4) is intended, despite the provisions of subsections (2) and (3), to prevent contractual provisions excluding modification except by a signed writing from limiting in other respects the legal effect of the parties' *actual later conduct*." (emphasis added)). Because the parties' conduct departing from the purchase-order term of the Agreement was

11

not a modification "executed by both parties in writing"[8] and thus not a valid modification under UCC 2-209(2), the question becomes whether the attempted modification nevertheless "operate[d] as a waiver" of the Agreement's modification clause. 810 ILCS 5/2–209(4).

An attempted modification by conduct operates as a waiver only if the party seeking to enforce the attempted modification "reasonably relied on the other party's having waived the requirement of a writing," or if "the waiver was clear and unequivocal." *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 297 (7th Cir. 2002) (cleaned up). A party has "relied" if it has "actually incurred a cost," *Wis. Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1287 (7th Cir. 1986), and the reasonableness of that reliance "is relative to commercial practices and understandings." *Cloud Corp.*, 314 F.3d at 297 (assessing the reasonableness of a party's reliance in the context of the parties' "smooth working relationship[,] the details of which were worked out in informal communications").

Even drawing all reasonable inferences for Sagacity, the record evidence definitively shows that the parties' conduct operated as a waiver of the modification clause. Midland relied on the attempted modification: when Sagacity proceeded under the parties' usual method of transacting—submitting last-day-to-change confirmations rather than purchase orders—Midland, too, continued with the usual process and incurred costs by ordering and shipping paper on Sagacity's behalf. What's more,

---

[8]Midland does not assert that the parties' conduct met the Agreement's modification requirement.

Midland's reliance was reasonable. The parties had a longstanding practice of how they transacted, and it was reasonable for Midland to believe that Sagacity—who could have initiated purchases by submitting purchase orders but instead continued submitting forecast confirmations—wished to maintain that longstanding practice. And Sagacity continued to accept and pay for paper ordered through the parties' longstanding practice for months after entering into the Agreement. Although reasonable reliance is often a question for the jury, here, "only one possible inference may arise" from the undisputed facts: Midland reasonably relied on Sagacity's waiver of the contract's modification clause. *Cent. Ill. Pub. Serv. Co. v. Atlas Minerals, Inc.*, 965 F. Supp. 1162, 1173 (C.D. Ill. 1997). So Midland's attempted modification of the purchase-order requirement operated as a waiver under UCC 2-209(4).

But Sagacity also argues that a waiver of the modification clause is barred by the Agreement's anti-waiver provision, which provided that "the failure of either party to insist on the strict performance" would "not operate as a waiver of any rights under this Agreement." Agreement at 2. Here, however, waiver is based not just on the failure of Sagacity to "insist on … strict performance," *id.*, but on Midland's reliance on that waiver, as allowed under UCC 2-209(4). Also, under Illinois law, anti-waiver clauses themselves "may be waived by the words and deeds of the parties, so long as the waiver is proved by clear and convincing evidence," which is the case here for the same reasons waiver of the Agreement's modification clause was effectuated. *PPM Fin., Inc. v. Norandal USA, Inc.*, 297 F. Supp. 2d 1072, 1087 (N.D. Ill. 2004).

13

With the modification clause waived, the next question is whether the Agreement was indeed modified by the parties' conduct and performance. Here, too, the Court concludes that any reasonable jury must conclude that a modification happened. A contract modification "is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed." *Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998). A contract is validly modified when "the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance." *Id.* (citing *Maher & Assocs., Inc. v. Quality Cabinets*, 640 N.E.2d 1000, 1007 (Ill. App. Ct. 1994)). It is true that contract modification is generally "a question of fact to be determined by the fact finder," but "if after consideration of the extrinsic evidence, the court determines" that a reasonable jury "could reach only one conclusion, the issue can be decided by the court as a matter of law." *Janda v. U.S. Cellular Corp.*, 961 N.E.2d 425, 437 (Ill. App. Ct. 2011) (cleaned up).

There is evidence abound, much of which overlaps with the evidence supporting waiver, that Sagacity continuously acquiesced to conducting business with Midland through the parties' well-established forecast-and-confirmation process. After the parties signed the Agreement, Midland Paper repeatedly sent emails to confirm Sagacity's forecasted paper needs. For months, Sagacity responded to those emails, confirmed its needs, and paid for the orders—even though they had not been made

pursuant to the supposedly required purchase orders.[9] *E.g.*, R. 80-2, PSOF, Exh. B, Grp. Exh. 3; R. 92, Add'l DSOF ¶ 7. Although Sagacity's President, Nicole Vogel, at one point generally objected about purchase orders in September 2019,[10] she did so only after Sagacity had already accepted and paid for numerous paper shipments under the prior process. And even after Vogel objected, Sagacity continued to request paper through confirmation emails—rather than by submitting purchase orders— and continued to pay the invoices. *E.g.*, R. 80-2, Exh. B, Grp. Exh. 3 (Sept. 24–25, 2019 emails); Yo Dep. at 30:6–10, 41:1–7; *see* R. 92, Add'l DSOF ¶ 7. On this record, a reasonable factfinder could only conclude that Midland's and Sagacity's conduct modified the purchase-order term of the Agreement, allowing the parties to place, confirm, and fulfill orders through their established confirmation process instead. *See McCray v. OmniSpeech, LLC*, 2021 WL 4477883, at *6 (N.D. Ill. Sept. 30, 2021) (granting summary judgment because the party "continued to accept … services").

---

[9]Indeed, Sagacity's Production Manager In Churl Yo testified in his deposition that Sagacity ordered paper by submitting last-day-to-change confirmations, and that those confirmations functioned like a purchasing order. Yo Dep. at 29:16–30:10.

[10]Sagacity contends that sometime around June or September 2019, its President Nicole Vogel exchanged calls and emails (dated September 11) with Midland to insist that the Agreement's purchase-order requirement be followed. R. 90, Def.'s Merits Resp. at 11; R. 92, Add'l DSOF, Exh. K, at 1. Vogel (who acknowledged she was not familiar with the manner in which Sagacity ordered paper from Midland, Vogel Dep. 20:18–21:4) did testify in her deposition that she asked Midland to "go back to signing all the purchase orders." Vogel Dep. 21:17–22. Even crediting this as true, Sagacity itself still did not initiate transactions by "issu[ing] valid Purchase Orders" and instead went ahead with confirming forecasts *after* Vogel's conversations with Midland. *See, e.g.*, R 80-2, Exh. B, Grp. Exh. 3 (Sept. 24–25, 2019 emails); *id.* (Oct. 28, 2019 emails); Yo Dep. at 30:6–10, 41:1–7.

In sum, even after drawing reasonable inferences in Sagacity's favor, the evidence of the parties' conduct and practices conclusively establishes that they modified the purchase-order provision of the Agreement, allowing Sagacity to order paper through confirmations, not just purchase orders. So, because Midland procured paper in accordance with the terms of their modified Agreement, Sagacity was then required to uphold its end of the bargain: to pay for the procured paper.

But Sagacity raises a final argument to avoid this conclusion; it contends that because Sagacity had not yet used the disputed paper (it was instead sitting in storage at the printers), Sagacity was thus not responsible for it. R. 90, Def.'s Merits Resp. 14–16. To make this argument, however, Sagacity relies on strained interpretations of the Agreement's provisions that discuss when paper is considered "Inventory" and falls within Midland's, rather than Sagacity's, ownership. *Id.* None of these interpretations hold water. The plain language of the contract governs, and it makes clear that—even if Midland owned the unused paper while the Agreement was in place— once Sagacity *terminated* the contract, Sagacity became responsible for "all remaining Inventory at Printer(s) locations." Agreement at 2. The termination provision does not limit Sagacity's responsibility to only the paper actually used by Sagacity. Quite the opposite.

In other words, under the plain terms of the Agreement, Sagacity was responsible for paying for all the paper it had ordered, including the unused paper stored at the printers. Sagacity breached the Agreement when it refused to pay for that paper, resulting in outstanding invoices totaling $88,102.00. R. 1-3. And there is no genuine

16

dispute that this total is the amount of damage suffered by Midland as a result of Sagacity's breach. Again, although Sagacity vaguely questions whether the paper related to those outstanding invoices "really exists" and how much paper was actually in storage, Sagacity presents no more than a scintilla of evidence that these are genuine factual questions. *See supra* 6 n.4. By refusing to pay the outstanding invoices amounting to $88,102.00, Sagacity breached the Agreement. Midland Paper's motion for summary judgment on its breach of contract claim is granted.[11]

## B. Attorneys' Fees

Sagacity seeks summary judgment, and Midland cross-moves for summary judgment, on the issue of attorneys' fees. Illinois generally follows the American Rule, which presumes that "the prevailing party in a lawsuit must bear the costs of litigation ...." *Brundidge v. Glendale Fed. Bank, F.S.B.*, 659 N.E.2d 909, 911 (Ill. 1995); *accord Rissman v. Rissman*, 229 F.3d 586, 588 (7th Cir. 2000) (applying Illinois law and noting that under the American Rule, the presumption is that "parties bear their own legal expenses"). That presumption, however, may be overcome where "an agreement between the parties allows the successful litigant to recover attorney fees and the expenses of suit." *Brundidge*, 659 N.E.2d at 911; *see also Grossinger Motorcorp, Inc. v. Am. Nat'l Bank & Tr. Co.*, 607 N.E.2d 1337, 1347 (Ill. App. Ct. 1992) ("An exception ... is when a contract provides for the award of such fees ...."). This type of

---

[11]Because the Court concludes that Midland is entitled to summary judgment on its breach of contract claim, it need not address Midland Paper's alternative argument that it "is entitled to summary judgment on its claim for accounts stated." R. 79, Pl.'s Br. at 10.

agreement—referred to as an indemnification or fee-shifting provision—is "generally regarded as valid and enforceable." *Hader v. St. Louis Sw. Ry. Co.*, 566 N.E.2d 736, 742 (Ill. App. Ct. 1991).

The parties' fees motions hinge on whether Sagacity is bound by the attorneys' fees provision contained in Midland's Terms and Conditions, found on its website, which stated that the Midland customer:

> shall further pay all costs and expenses, including, but not limited to, reasonable attorney's fees, court costs and collection costs, that Midland may incur in connection with the enforcement by Midland of any available remedy, including, but not limited to, any action by Midland for all or any portion of the price of the goods sold hereunder, all or any portion of any other sum due by you hereunder, or recovery by Midland of any products sold to you by Midland.

R. 76, Exh. A, Exh. 1 (Midland Terms and Conditions); *see* R. 76, Morley 10/26/22 Decl. ¶ (c) (attesting that the attached Exhibit 1 is a true and accurate copy of the Terms and Conditions as they existed as of February 2019, and further attesting that the Terms and Conditions "were referenced on each and every Midland Paper invoice issued to S[agacity] both before and after the signing of the Agreement"). Midland argues that Sagacity is bound by the Terms and Conditions containing the fees provision because they were (1) attached as an exhibit to, and therefore incorporated into, the Agreement; and (2) referenced in the invoices sent to Sagacity. R. 74, Pl.'s Fees Resp. at 4–8. Sagacity argues that the Terms and Conditions were never attached to the Agreement, and that the Agreement was not later modified by the invoices to include the fees provision. R. 69, Def.'s Fees Mot. at 4–8.

### 1. Exhibit A of the Agreement

Midland asserts that the Terms and Conditions were incorporated into the Agreement because they "were attached as Exhibit A to the Agreement" and because, when Sagacity negotiated the terms of the Agreement, Sagacity "knew that it was agreeing to the Terms and Conditions set forth in 'Exhibit A.'" Pl.'s Fees Resp. at 4. "Generally, one instrument may incorporate another instrument by reference." *Dixon v. GAA Classic Cars, LLC*, 145 N.E.3d 429, 436 (Ill. App. Ct. 2019) (cleaned up). "Contracts which specifically incorporate other documents by reference are to be construed as a whole with those other documents." *Wiczer v. Wojciak*, 30 N.E.3d 670, 680 (Ill. App. Ct. 2015). But "[m]ere reference to another contract or document is not sufficient to incorporate its terms into a contract." *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 715 (7th Cir. 2019) (cleaned up). Instead, "there must be an express intent to incorporate." *Id.* (cleaned up).

There are genuine factual disputes on three crucial questions: whether an Exhibit A to the Agreement ever existed, whether Exhibit A contained Midland's Terms and Conditions, and whether Sagacity was aware of the existence and contents of Exhibit A. Yes, the Agreement does expressly cite an Exhibit A: "Customer agrees to pay … invoices within the agreed upon Midland payment terms (*see Exhibit A*)." Agreement at 2 (emphasis added). But the Agreement does not specify what "Exhibit A" is, nor does it include any reference to Midland's Terms and Conditions. *See* Agreement. Indeed, Sagacity argues that there was never any "Exhibit A" attached to the Agreement at all. R. 82, Defs.' Resp. Add'l PSOF ¶ 9. In support of this argument,

Sagacity has submitted the declaration of Sagacity President Vogel, who was "famil-iar with and was involved in the negotiation of the" Agreement. R. 82, Vogel Decl. ¶ 2. Vogel attests that despite the reference to an Exhibit A in the Agreement, Vogel never saw or discussed with Midland any Exhibit A to the Agreement; Sagacity found no record of any "Exhibit A" or any document describing what Exhibit A might contain; and Vogel was not aware of Sagacity ever transmitting or discussing an Exhibit A with Midland before or after executing the Agreement. *Id.* ¶ 3. Also attached to Vogel's declaration is a set of emails discussing the Agreement but with no mention of any attached Exhibit A. *Id.* ¶ 3; R. 82, at 8–9 (emails).

Midland admits that it cannot find a paper copy of the executed Agreement (even though Midland is a paper-supply company) with an attached Exhibit A, but insists that there *was* an attached Exhibit A containing the fees provision and that Sagacity "knew that it was agreeing to the Terms and Conditions set forth in 'Exhibit A'" when it executed the Agreement. Pl.'s Fees Resp. at 4. In support, Midland has submitted the declaration of Frank Morley, the Midland Sales Account Manager responsible for the Sagacity account. R. 76, Morley 10/26/22 Decl. ¶ 1. Morley attests that he "[knew] from [his] negotiation of the terms of the Agreement … that the 'Exhibit A' referenced [was] Midland Paper's Terms and Conditions," which included the attorneys' fees provision. Morley 10/26/22 Decl. ¶ 1(b)–(c), (f). Attached to Morley's declaration is a copy of Midland's Terms and Conditions as they existed in February 2019, which Morley attests constituted "the 'Exhibit A' to the Agreement." *Id.* ¶ 1(c).

20

Construing the evidence in favor of Midland, a reasonable jury could credit Morley's declaration, determine that the fees provision was a part of the Agreement when the parties executed it, and conclude that Sagacity was contractually bound by the fees provision. But—construing the evidence in favor of Sagacity—a reasonable jury could credit Sagacity's declaration and conclude the exact opposite. Given the parties' opposing declarations, there remain genuine disputes of material fact as to whether an Exhibit A containing the fees provision actually existed and was a part of the Agreement when the parties entered into it. In other words, neither party is entitled to summary judgment based on Exhibit A to the Agreement.

### 2. Invoices

The parties next dispute whether Midland's Terms and Conditions (along with the fee-shifting provision) were incorporated via invoices. R. 71, Def.'s Fees Br. at 5–8; Pl.'s Fees Resp. at 5–11. Throughout the parties' business relationship, Midland sent Sagacity invoices for the paper that Midland had ordered for Sagacity. At the bottom of each invoice was the following statement:

> This order is subject to the terms and conditions appearing hereon and at WWW.MIDLANDPAPER.COM/PAGE/TERMS, and by accepting this order, by written acknowledgement or acceptance of goods as set forth herein, you agree to be bound thereby.

*E.g.*, R. 1-2 (Dec. 2019 invoices); R. 76-2, at 86–87 (May 2016 invoice).[12] The website cited in the invoice is a webpage with Midland's Terms and Conditions, including the

---

[12]In its briefing, Sagacity does not dispute that this "terms and conditions" statement, with a link to Midland's website, was included in all the invoices Midland sent to Sagacity throughout their business relationship. *See* R. 71, Def.'s Fees Br.; R. 81, Def.'s Fees Reply.

21

attorneys' fees provision. Morley 10/26/22 Decl. ¶¶ (e)–(f); R. 76, Exh. A, Exh. 1 (Midland's Terms and Conditions); *see, e.g.*, R. 81, Def.'s Fees Resp. at 9–13 (discussing Midland's invoices and not disputing that they contained a website link to Midland's Terms and Conditions, nor disputing that the Terms and Conditions contained the attorneys' fees provision).

Midland argues that its Terms and Conditions were "incorporated as additional terms to the Agreement" because "of their inclusion on every invoice" Midland sent to Sagacity. Pl.'s Fees Resp. at 5. Midland asserts that Sagacity accepted the modification of the Agreement "through its silence and payment of the invoices that incorporated the Terms and Conditions." *Id.* at 10. Sagacity does not dispute that Midland's invoices included the statement containing a link to Midland's Terms and Conditions, but it does dispute that Sagacity knew about or accepted the addition of the Terms and Conditions. R. 81, Def.'s Fees Reply & Resp. at 7–13; *see* R. 93, Add'l DSOF, Exh. C (Vogel Dep.) at 51:12–52:2.

Just as it did with the breach of contract claim discussed earlier, UCC Section 2-209 governs whether the Terms and Conditions in the invoices modified the Agreement.[13] *See* 810 ILCS 5/2-209. Sagacity did not consent in writing that it would pay

---

[13]Midland asserts that UCC Section 2-207, rather than Section 2-209, applies, but presents no arguments as to why Section 2-207 is the applicable provision. That Section governs additional terms contained in a "definite and seasonable expression of acceptance or a written confirmation." Indeed, Comment 1 of UCC 2-207 explains that a "typical situation[]" this Section is intended to deal with is "the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed." Midland does not articulate why the invoices here

for Midland's attorneys' fees (nor does Midland assert that the fees provision was "executed by both parties in writing," as required by the Agreement's modification clause). *See* Pl.'s Fees Resp. at 5. So, under Section 2-209(2), Midland's attempt to add the fees provision to the Agreement was unsuccessful—unless the attempted modification "operate[d] as a waiver" under Section 2-209(4).

As discussed above, an attempted modification operates as a waiver when the modifying party "reasonably relied" on waiver or the waiver was "clear and unequivocal." *Cloud Corp.*, 314 F.3d at 297. As to reasonable reliance, Midland summarily asserts that it "reasonably relied on [Sagacity's] waiver," but it fails to specify how it so relied—such as identifying any costs it incurred or any changes it made in reliance—and what evidence supports that assertion. Pl.'s Fees Resp. at 10. Whether there was "clear and unequivocal" waiver, however, is a closer question, as the evidence cuts both ways. On one hand, construing the evidence in Midland's favor, Sagacity received and paid hundreds of invoices (Midland identified over 1,000 invoices) from Midland over the span of several years—both before and after entering into the Agreement—and the invoices contained a statement in bold referring to, and providing a link to, Midland's Terms and Conditions. *E.g.*, R. 80, PSOF ¶ 6; Dec. 2019 Invoices; R. 76, PSOF, Exh. B pt. 2, at 1 (invoice dated Dec. 7, 2016). What's more, Vogel

---

should be considered an "acceptance or a written confirmation" of the Agreement—a fully executed, written contract. Because Midland's argument is that the terms in the invoices later modified the Agreement, the Court applies Section 2-209, which governs modifications of preexisting contracts.

acknowledged that she reviewed all of the invoices Midland ever sent to Sagacity as part of cutting checks to Midland. R. 76, PSOF, Exh. C (Vogel Dep.) at 11:17–21, 64:7–14. A reasonable jury could conclude that Sagacity's receipt and payment of so many invoices was a clear and unequivocal waiver. But on the other hand, construing the evidence in Sagacity's favor, a reasonable jury could conclude that Sagacity's payment of invoices was not a clear and unequivocal waiver because the Terms and Conditions were merely linked in a boilerplate statement in small font at the bottom of the invoices. Or the jury could credit Vogel's deposition testimony and conclude that Sagacity was not aware of the reference to Midland's Terms and Conditions in the invoices. Vogel Dep. at 51:12–52:2; *see also* Yo Dep. 54:12–55:2 ("I don't recall. I'm sure [the statement in the invoices] was there, but I never looked.").

Based on this record, a reasonable jury could conclude that Sagacity's silence and payment of the invoices did not operate as a waiver, and thus the fees provision did not become a part of the Agreement. But a reasonable jury could conclude the contrary, too. Beyond waiver of the modification clause, there also remain factual disputes as to whether Sagacity then acquiesced to the inclusion of Midland's Terms and Conditions, thereby modifying the Agreement.

In sum, neither party has satisfied its burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law on the attorneys' fees issue.

## IV. Conclusion

Because Midland has shown it is entitled to judgment as a matter of law on its breach of contract claim, its motion for summary judgment on the merits, R. 78, is granted. But neither party has made such a showing on the issue of attorneys' fees; both of the summary judgment motions on fees, R. 69 and R. 74, are denied. The parties shall promptly initiate settlement discussions and file a status report on the next step of the litigation by April 19, 2024.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 30, 2024